# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-02-00690-CR

**Robert Lee Coggin, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF CALDWELL COUNTY
### NO. 29,925, HONORABLE EDWARD L. JARRETT, JUDGE PRESIDING

### 4444444444444444444444444
### DISSENTING OPINION
### 4444444444444444444444444

Few principles are as basic as the general notion that a reviewing court, when reviewing issues of fact, should never substitute its judgment for that of the jury when *some* evidence exists to support the finding made by the jury. Because the majority today violates that principle, I respectfully dissent.

The majority opinion concludes that no rational trier of fact could have found the elements of the offense of disorderly conduct beyond a reasonable doubt by asserting that no evidence exists to support such a finding. *See* Tex. Pen. Code Ann. § 42.01(a)(2) (West 2003). In doing so, the majority strays from the basic mandate that a reviewing court should so find only when the evidence is insufficient as a matter of law to support a finding of guilt and that the issue therefore

should never have been submitted to the jury. *See Clewis v. State*, 922 S.W.2d 126, 132 (Tex. Crim. App. 1996).

The penal statute in question provides that "[a] person commits an offense if he intentionally or knowingly: . . . makes an offensive gesture or display in a public place, and the gesture or display tends to incite an immediate breach of the peace." Tex. Pen. Code Ann. § 42.01(a)(2) (West 2003). The only element at issue in this case is whether the offensive gesture "tends to incite an immediate breach of the peace." *See id.* Thus, we should not assess the result of the incident, but rather assess the potential for violence as a result of the gesture. Clearly, the state may prohibit speech or conduct which has a tendency to incite or produce immediate violence. *See Texas v. Johnson*, 491 U.S. 397, 409 (1989); *Gooding v. United States*, 405 U.S. 518, 522 (1972); *Cohen v. California*, 403 U.S. 15, 20 (1971); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). Whether the offensive gesture "tends to incite an immediate breach of the peace" is a question of fact. *See Woods v. State*, 213 S.W.2d 685, 687 (Tex. Crim. App. 1948); *State v. Rivenburgh*, 933 S.W.2d 698, 701 (Tex. App.—San Antonio 1996, no pet.); *Estes v. State*, 660 S.W.2d 873, 875 (Tex. App.—Fort Worth 1983, pet. ref'd) ("We must consider if the gesture in this case, under all of the attendant circumstances, amounted to fighting words."). In determining whether an offensive gesture tends to incite imminent violence, we must "consider the gesture as being directed to an average person" and not the intended recipients. *Estes*, 660 S.W.2d at 875. That the intended recipients did or did not become violent is irrelevant. Rather, we are to consider how the *average* person would have reacted when considering whether the offensive gesture amounted

2

to fighting words. *Id.*; *see also Johnson*, 491 U.S. at 409 (stating that the expressive conduct at issue must fall within the narrow class of speech constituting fighting words likely to provoke an average person to retaliate). Of course, the determination of how an average person would react is properly made by the jury and it "is not the function of this court to substitute its finding for that of the jury." *Estes*, 660 S.W.2d at 687.

Even if the majority's approach—measuring the degree to which the Pastranos reacted to appellant's gesture—were applicable, there is evidence in the record that John Pastrano restrained himself from violence. John Pastrano said he was so angered by the gesture he wanted to defend himself and his wife. If the measure is whether a particular recipient reacted violently, there could be no uniform application of this law because its application would rest on whether there was, in fact, violence and not on whether the speech or conduct would have a tendency to produce violence in the average person. *See Cohen*, 403 U.S. at 20 (describing fighting words as speech or gestures that, "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"); *Woods*, 213 S.W.2d at 687 (defining disorderly conduct as "acts such as intend to excite violent resentment or to provoke or excite others to break the peace"). The majority's application of the standard would defeat the purpose for the law—to prevent gestures, words, and conduct that incite violence. *See Woods*, 213 S.W.2d at 687.

The majority then commits its second error in conducting its legal sufficiency review of the case at hand. A review of a criminal conviction under a legal sufficiency standard requires a court to consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable

3

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Thus, an appellate court must look at all the evidence and consider which evidence supports the verdict.  *Clewis*, 922 S.W.2d at 132 n.10.  Of the evidence which tends to support the verdict, the appellate court must determine if that evidence rationally supports a finding of each element of the offense.  *Id*. at 132.

In this case, there is ample testimony supporting the jury's conclusion that the offensive gesture, in these circumstances, would tend to incite an average person to immediate violence.  John Pastrano was driving in the inside lane of U.S. Highway 183 in Lockhart with his wife, Robin Pastrano.  At one point, John looked into his rearview mirror and noticed behind him a white Crown Victoria driven by appellant.  John estimated he was traveling fifty miles per hour during the time appellant was behind him.  Robin estimated their speed at seventy miles per hour.  John testified that appellant was flashing the bright lights of the car on and off and motioning for John to move over.  Appellant tailgated the Pastranos, at a distance of two to three feet, for approximately one-quarter mile.  John, thinking that he was being pulled over by a police officer, moved into the right lane.  Both John and Robin testified that as appellant passed them, he directed the obscene gesture at them.[1]

Appellant admitted that he was the driver of the car tailgating the Pastranos.  Appellant said he was running late for his *tae kwan do* class in Lockhart when he came up behind the Pastranos in the left lane of the road.  As appellant explained the incident:

---

[1]  John Pastrano testified that Appellant nearly caused two more accidents after he passed them.  Robin Pastrano testified that after Appellant passed them, he moved into the slow lane to pass a tractor trailer then moved back into the fast lane.

4

[The Pastranos were] in the passing lane. There was no traffic in the right lane. I wasn't going to pass him on the right because I've been told that's illegal here. So I pulled up behind him. I didn't get real close to him initially. I gave him time to see my car and pull over. He did not pull over.

I got behind him a little closer and I flashed my lights. I flashed my brights. They don't wig-wag. They just go like this (indicating). And he didn't pull over even after that. I so motioned in my windshield, "Hey, could you please get over?" He eventually pulled over . . . .

Finally, when asked in court if he had told the officer issuing the citation, "Yeah I was on his ass because he was in the left lane and was going slow[,]" Appellant testified, "[t]hat sounds like something I would say." Appellant denied making the gesture.

Given these facts and attendant circumstances, the issue is whether a jury could reasonably find that these circumstances are likely to incite an average person to violence. For the majority to conclude that no rational trier of fact could reach the conclusion reached by this jury is quite simply a substitution of its judgment for that of the jury. Looking at the evidence and attendant circumstances in a light most favorable to the verdict reveals that appellant rode the Pastranos' bumper for a distance of one-quarter mile at a speed somewhere between fifty and seventy miles per hour. Appellant could have passed the Pastranos in the right lane but instead chose to tailgate them and force them over at the risk of an accident. Appellant was so impatient and so unyielding that he began motioning and signaling the Pastranos to pull over. He then pulled alongside of the Pastranos and raised his middle finger in an obscene gesture universally understood to mean "f---you." Given these facts, a jury could reasonably believe that the gesture, in the context of its attendant circumstances, would have a tendency to incite immediate violence in an average person.

5

That these facts and attendant circumstances did not incite the Pastranos to immediate violence is inconsequential, and reversing the verdict premised on the fact that the Pastranos did not retaliate with their own breach of the peace is erroneous. The majority opinion is premised on the following: because the Pastranos were not moved to violence, appellant's gesture did not constitute fighting words. Yet, as the majority opinion correctly sets out, the test is whether the words, "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *See Cohen*, 403 U.S. at 20; *Virginia v. Black*, 123 S. Ct.1536, 1547 (2003).

The facts of this case are distinguishable from the cases in which courts held the evidence failed to support a breach of the peace. In *Cohen*, the Supreme Court reversed a conviction of a man wearing a jacket bearing the words "F--- the Draft" because "[n]o individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult." *Cohen*, 403 U.S. at 21. In *Cantwell*, the Supreme Court reversed a conviction of members of Jehovah's Witnesses charged with breaching the peace in distributing religious materials because there was no showing that in disseminating the material the appellants were "noisy, truculent, overbearing or offensive." *Cantwell*, 310 U.S. at 309. In *Johnson*, the Supreme Court reversed the conviction of a man accused of burning the American flag because the circumstances surrounding the flag burning indicated that the act was generally directed at inducing a condition of unrest, creating dissatisfaction and even stirring people to anger about the policies of the federal government. 491 U.S. at 410. In *Cannon*, the Tenth Circuit reversed the conviction of appellants accused of breaching the peace by carrying signs stating "The Killing Place" outside an abortion clinic. 998 F.2d 867, 873 (10th Cir. 1993). The majority cites these opinions for the proposition that

6

conduct that angers some people could not constitute fighting words. Generally, that proposition is true depending on the circumstances, such as where the conduct was intended as an impetus to change. *See Johnson*, 491 U.S. at 410; *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). *Cannon* does not stand for the general proposition, though, that conduct that angers people to the point of violence is constitutionally protected. A necessary prerequisite to retaliatory violence is anger, so it goes without saying that speech arousing anger may amount to fighting words in some circumstances.

In addition, I believe that the *Rivenburgh* case from the San Antonio Court of Appeals supports my position. *See State v. Rivenburgh*, 933 S.W.2d 698 (Tex. App.—San Antonio 1996, no pet.). In that case, the court upheld a trial court's order suppressing evidence that a woman made a vulgar gesture with her middle finger and mouthed an obscenity toward drivers stopped behind her at a red light in a breach the peace action. *See Rivenburgh*, 933 S.W.2d at 701. *Rivenburgh* is an affirmance of a suppression order and a perfect example of how an appellate court should review a fact finder's conclusion on the issue of whether particular conduct could tend to incite imminent violence. The court of appeals said, "[w]e presume the trial court applied the elements of the offense of disorderly conduct to the facts and found that a prudent man would not believe that Rivenburgh had committed the offense." *Id*. In addition, "[t]he trial judge was free to disbelieve any or all of the testimony" of the one witness who saw the offensive gesture and heard the obscenities even though there was no indication the witness was, in fact, lying. *Id*. The court concluded that "[t]hough it may even rise to the level of common knowledge that this gesture and these words mouthed by a Texas motorist has led to breaches of the peace and even the loss of life, the trial court

7

could have found that the gesture did not tend to incite an immediate breach of the peace *at this time and place*." *Id.* (emphasis added).

In our case, the majority concedes that, in some circumstances, appellant's gesture could tend to incite an immediate breach of the peace—but not in this case because the contact was brief, the participants were strangers, and the Pastranos experienced only momentarily feelings of hostility. That an offensive gesture made and similar words mouthed by a Texas motorist might have a tendency to lead to a breach of the peace and even the loss of life at another time and in another place is left open both in *Rivenburgh* and in the majority's opinion—and rightly so. What the majority fails to consider is that once a fact finder has reviewed the evidence, believed the testimony of the witnesses, observed their demeanor, considered the attendant circumstances and concluded that at the time and place in question the defendant did engage in conduct an average person could find would tend to incite an immediate breach of the peace, then a reviewing court must defer to that determination except for instances where no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The majority also relies on the fact that appellant and the Pastranos did not have a face-to-face encounter, stating that more than an "impersonal, brief encounter" is needed. Left unstated is the supposition that only a face-to-face encounter can provide the scenario needed to produce the setting for an immediate breach. In *Sandul v. Larion*, for example, a man was accused of shouting the words "f--- you" to a group of abortion protesters and giving them the finger as he drove by. 119 F.3d 1250, 1252 (6th Cir. 1997). A police officer, who was talking with the protesters on the street when the defendant drove by and was the only witness to the gesture and the only

8

person who heard the epithet, pursued the man and caught up with him at his home. *Id.* After being acquitted of a charge of disorderly conduct, the defendant sued the officer for unlawful arrest. *Id.* The district court granted the officer summary judgment on the false arrest charge finding the officer had probable cause to arrest the defendant and was thus immune from suit. *Id.* The Sixth Circuit, though, noted that an official loses his immunity where a reasonable person would have known the defendant had a "clearly established" right to engage in the challenged conduct. *Id.* at 1254. The Sixth Circuit held that the arresting officer should have known that the defendant's speech was constitutionally protected; consequently, the officer did not qualify for immunity. *Id.* at 1255. The court also concluded the defendant's words were not fighting words because the conduct and speech was shouted from the window of a motorist "traveling at a high rate of speed on the opposite side of the street, a considerable distance away from the protesters to whom the language was directed" and thus could not have had a tendency to incite immediate violence. *Id.* Also relevant to the court's conclusion was the fact that none of the protesters heard the insult or saw the gesture. *See id.*

In the present case, all of the ingredients for immediate violence were present. Both parties were in automobiles, and both automobiles were traveling in the same direction. Pastrano had the capacity to react immediately by accelerating in pursuit of appellant. One must ignore the reality of modern life to not recognize that many instances of "road rage" begin in just such a manner, and consideration of "road rage" easily could have factored into the thought process of the jury.

The majority cites numerous cases to support the proposition that a face-to-face encounter is required. None of the cited cases dictates that factor as a prerequisite, and a close look

9

at these cases reveals that distinguishing factors are present in each. In *Garvey v. State*, the Tennessee Court of Criminal Appeals reversed a woman's conviction for disturbing the peace by shouting "sooey" to a police officer. 537 S.W.2d 709, 711 (Tenn. Crim. App. 1975). The court concluded:

> Under the evidence here, the defendant's conduct (words) did not amount to 'fighting' words as contemplated by the statute. There was no direct, face-to-face conduct or other exigent circumstances here. This word addressed to a police officer trained to exercise a higher degree of restraint than the average citizen would not be expected to cause a breach of the peace.

*Id*. (referring, in part, to *Lewis v. New Orleans*, 408 U.S. 913, 913 (1972) (Powell, J., concurring) (proposing that words spoken by one citizen to another, face-to-face, might, in some circumstances, amount to fighting words but that those same words, in other circumstances, spoken by a citizen to a police officer might not amount to fighting words)).

In *Matter of Welfare of S.L.J.*, the Minnesota Supreme Court reversed the conviction of a fourteen-year-old girl accused of shouting the words "f--- you pigs" to two police officers. *Matter of Welfare of S.L.J.*, 263 N.W.2d 412, 415 (Minn. 1978). The reversal of conviction in that case was premised on two grounds: the relevant statute was overbroad and the speech did not rise to the level of fighting words because the attendant circumstances were such that "there was no reasonable likelihood that they would tend to incite an immediate breach of the peace." *Id*. at 420.

In *Hershfield v. Commonwealth*, the Virginia court of appeals reversed the conviction of a man accused of disorderly conduct for telling his neighbor to "go f--- yourself." 417 S.E.2d 876, 876 (Va. Ct. App. 1992). In reversing the conviction, the court looked at the attendant circumstances

10

and noted that when the defendant made the comment at issue he was standing fifty-five to sixty feet away from his neighbor and was separated from her by a chain-link fence. *Id*. at 877. The particular statute at issue stated that "[i]f any person shall, in the presence or hearing of another, curse or abuse such other person, or use any violent abusive language to such person concerning himself or any of his relations, or otherwise use such language, under circumstances reasonably calculated to provoke a breach of the peace, he shall be guilty of a Class 3 misdemeanor." *See id*. Prevailing state supreme court precedent required the confrontation to be "face to face." *See id.* at 878. The court concluded that because an essential element of the offense was "in the presence or hearing of another," the distance separating the neighbors circumstantially precluded immediate violence. *Id*.

As a result, the cases cited by the majority support my contention that whether the offensive conduct constituted fighting words and thus would tend to incite an average person to violence is determined by looking at the attendant circumstances. There are as many cases affirming breach of the peace convictions as there are ones reversing those convictions. Although the majority contends the facts in *Estes* are distinguishable, that case is squarely on point. *See* 660 S.W.2d 873. In *Estes*, the defendant "extended the middle finger of his right hand" a few inches from the school principal's face as he received his high school diploma from the principal. 660 S.W.2d at 874. The majority contends *Estes* is inapplicable because the setting in that case was civil and formal, the gesture was made only inches away from the recipient's face and was prolonged, and the parties were in close proximity to each other and knew each other. *See id*. However, the only circumstance here at odds with *Estes* is whether or not the parties knew each other. And the most significant similarities between the two cases compel a similar outcome. Here, appellant and the Pastranos were

11

only feet away from each other at all times relevant to their encounter. Likewise, unlike the circumstances in *Sandul* and more like the circumstances in *Estes*, Pastrano was in a position, if he chose, to chase appellant down. It is even possible to conclude that, as a jailer in the sheriff's department, Pastrano, like the principal in *Estes* and the police officer in *Lewis*, was self-controlled and able to restrain himself from retaliation.[2] The entire incident spanned fifteen to twenty seconds, given speeds of fifty to seventy-five miles per hour for a distance of a quarter mile. All told, because enough evidence exists for a reasonable jury to believe that the gesture, coupled with its attendant circumstances, would have a tendency to incite immediate violence in an average person, appellant's arguments should fail to persuade this court to reverse the conviction under a legal sufficiency review.

Appellant also claims that the evidence is factually insufficient to support a conviction for disorderly conduct.[3] A factual sufficiency review considers whether "a neutral review of the evidence, both for and against the finding" shows the evidence to be so obviously weak as to undermine confidence in the jury's determination or that the evidence supporting the conviction is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). An appellate court reviews the fact finder's weighing of the evidence. *Id*. The appellate court is then free to disagree with the fact finder's determination. *Clewis*, 922 S.W.2d at 133. Although the appellate court should be properly deferential to the fact finder's judgment so as avoid a substitution

_____

[2] In fact, John Pastrano testified that he restrained himself from retaliating.

[3] Because the majority reversed the conviction under a legal sufficiency review, it never reached Appellant's factual sufficiency claim or his fifth issue concerning probable cause for the issuance of the citation.

12

of judgment, the court should consider all of the evidence to prevent a "manifestly unjust result." *Id.* at 133, 135. In other words, to find that the evidence is factually insufficient means that the court "determines that the verdict is against the great weight of the evidence . . . so as to be *clearly wrong and unjust*." *Id.* at 135.

I fail to see, given all the evidence available in this case, that appellant's conviction of disorderly conduct resulted in manifest injustice. Although appellant denied making the gesture in question, his testimony was contradicted by both John and Robin Pastrano. He offered no other evidence in support of his assertion. In addition, he readily admitted to all of the "attendant circumstances" that I found compelling in my review of the legal sufficiency of the evidence. As a result, I would find no basis to determine that a conviction in this case was clearly wrong and unjust. As a result, I would reject appellant's argument that the evidence is factually insufficient to support a conviction and therefore would overrule appellant's fourth issue in its entirety.

Finally, in his fifth issue appellant argues that no probable cause existed for officers to issue a citation. *See Torres v. State*, 868 S.W.2d 798, 801 (Tex. Crim. App. 1993). However, appellant does not cite the record in support of his proposition, nor does he identify what relief he is claiming under this argument. As a result, appellant has not provided sufficient argument for us to reach the merits of the claim. *See* Tex. R. App. P. 38.1(h).

While I concur in the majority's analysis of the first three issues, because I would overrule appellant's legal and factual sufficiency challenges, I would affirm the judgment of the trial court.

13

I respectfully dissent.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Dally[*]

Filed: October 9, 2003

---

[*]  Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).